FILED IN CHAMBERS
U.S.D.C. Atlanta

DEC 12 2005

LUTHER D. THOMAS, Clerk
By: ⟨signature⟩
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHRISTOPHER ALFRED,[1]

      Plaintiff,

    v.

S.J. POWELL, et al.,

      Defendants.

CIVIL ACTION

NO. 1:03-CV-2683-RLV

O R D E R

This is an action pursuant to 42 U.S.C. § 1983, in which the plaintiff alleges that he was illegally arrested, falsely imprisoned, and maliciously prosecuted in violation of the Fourth and Fourteenth Amendments and in violation of Georgia state law. Pending before the court is defendant P. Mitch Mitchell's[2] motion for summary judgment [Doc. No. 37].

---

[1] When the plaintiff was first arrested, he told the booking police officers that his name was Christopher Battle. Battle was the surname of the plaintiff's stepfather. While the plaintiff never formally changed his name to Battle, he regularly interchanged both surnames, Alfred and Battle.

[2] In addition to defendant Mitchell, the plaintiff originally sued S.J. Powell, who was another DeKalb County, Georgia, police officer. In his response to the defendant's motion for summary judgment, the plaintiff conceded that Powell should be dismissed as a defendant. The court accepts the plaintiff's counsel's statement as the functional equivalent of a formal voluntary dismissal. Therefore in addressing the current motion for summary judgment, the court concludes that only one defendant, Mitchell, remains in this suit. With regard to Mitchell, Mitchell was misnamed in the plaintiff's complaint as Keith Mitchell and should be identified as P. Mitch Mitchell.

1

## I. Procedural History

The facts presented here are excerpted from the parties' Statement of Material Facts as well as the court's independent review of the record.  Christopher Alfred initiated this action against DeKalb County, Georgia, police officers Mitchell and Powell pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourth as well as Fourteenth Amendments to the United States Constitution.  Specifically, the plaintiff alleges that he was illegally arrested, falsely imprisoned, and maliciously prosecuted when he was arrested and charged with felony obstruction and making terroristic threats in March 2001.  The plaintiff also brought state law causes of action for false arrest, false imprisonment, and malicious prosecution against  Mitchell and Powell.

On March 5, 2001, Officers Mitchell and Powell responded to a call of a person discharging a firearm at 3318 Manson Road, Lithonia, Georgia.  Upon the officers' arrival at the scene, the complainant indicated that she believed the gunshots were coming from behind her property.  The two police officers checked around the complainant's property and encountered four men and one female sitting on the back of a black pickup truck drinking beer and smoking marijuana.  After seeing the police officers, the subjects tried to hide the marijuana, and two of the male subjects sitting on the back of the truck fled the location on foot.  Both Powell and Mitchell chased the two fleeing subjects.  Mitchell was unable

2

to apprehend the subject he had chased and quickly returned to the scene, where the other subjects had remained.   Powell caught his fleeing subject; however, Powell did not witness the initial encounter between Mitchell and the plaintiff.

After Mitchell returned to the original scene, he attempted to approach the remaining suspects to search and handcuff them.   The plaintiff,[3] who was a bystander and not a suspect, testified that he was on his way to play chess with a friend when he witnessed the suspects, who were friends of one of his sisters, being questioned by Mitchell.   In his deposition, the plaintiff admitted that it was his opinion that the suspects whom Mitchell was questioning were probably drinking and smoking marijuana.   The plaintiff further testified that he became involved in the situation with Mitchell and the suspects after he witnessed Mitchell pat down the female suspect in what the plaintiff characterized as an inappropriate manner.   According to the plaintiff's testimony, the plaintiff interjected himself into the situation and approached the female suspect to warn her of Mitchell's inappropriate behavior and to tell her that she should get a lawyer.   The plaintiff testified

---

[3] The plaintiff lived with his mother and sisters in the Lithonia, Georgia, near the location of the incident. Additionally, the evidence indicates that the plaintiff had a criminal record; he has been arrested around ten times and was incarcerated for extended durations several times in California. Moreover, the plaintiff was a former member of the Crips street gang in the Los Angeles, California, area and has numerous tattoos covering his upper body some of which indicate his former street gang membership.

3

that Mitchell told him to "go home" and leave the scene.   The plaintiff admitted that he refused to leave the scene despite having been repeatedly told to leave.   Thereafter, the plaintiff and Mitchell got into a verbal confrontation, resulting in Mitchell pushing the plaintiff.[4]

A factual dispute in the record exists as to what happened between the plaintiff and Mitchell that caused Mitchell to push the plaintiff.   The plaintiff admits that he exchanged hostile words with Mitchell.[5]   The plaintiff testified that his confrontation

---

[4] The plaintiff testified as follows:
A: . . . So, first of all, I know from dealing with the police that a male officer is not supposed to put his hands on a woman.   I said, Myra, if I was you, I would talk to my mama and have her call a lawyer.   He was not supposed to touch you.   [Mitchell] say, you, shut up and go in the house.   I say, look-

Q: He pointed his finger at you?

A: Yeah, he pointed you need to go in the house.   I said, man, I'm a grown man.   I got a son that's 14 and this ain't Afghanistan.   I can say what I want.

[5] The plaintiff testified:
Q: Okay.   So what happened after that?

A: We exchanged some words.

Q: Like what did y'all say?

A: We said some derogatory stuff.

Q: Like what?

A: You know, I called him a house negro.   I said you out here showing out your colors in front of your people.   I said I would expect this, you know, from somebody else but not nobody as black as you.

4

with Mitchell started as a shouting match and escalated when
Mitchell left the suspects he was attending to in order to push the
plaintiff.[6]     On  the  other  hand,  Mitchell  testified  that  the

---

Q: What does that mean?

A: Meaning that, you know, by you being a black man, you
out here harassing your folks like that and the white
police will come over there and treat us like gold.  How
you doing, Mr. Alfred and Mr. Battle or whatever it is,
and send you on your way.  I said but unfortunately you
came over here and just treated us like, you know, we was
nobodies.

[6] The plaintiff testified:
Q: So you said some words to the officer.  What did he say
back to you?

A: He told me I need to shut the fuck up and go in the
house, I don't think that was professional coming from an
officer.

Q: Those were his exact words?

A: Those were his words, and I told him you need to go
make you some kids so you can tell yours to shut the fuck
up.

Q: Okay. What else did y'all—

A: We went back and forth till he finally left what he
was doing and he come over here and he pushed me.

A: Did he-- excuse me. Did he finish what he was doing?

Q: No, he didn't finish what he was doing.  He left them.
He left the three detainees or whatever you would call
them.

Q: Were they in handcuffs?

A: No, wasn't nobody in handcuffs.  He just had them
hemmed up, one laying on the ground going through their
stuff, but when he left them, he came to me and pushed me
and I said you keep your dig beaters up off of me.

plaintiff got into his "personal space" and that the plaintiff pushed his chest against Mitchell's chest which caused Mitchell to push the plaintiff away.[7]   Regardless of whether the plaintiff pushed his chest against Mitchell or Mitchell left the suspects to push the plaintiff, Mitchell does not dispute that he pushed the plaintiff.

After the initial confrontation with the plaintiff that resulted in Mitchell pushing the plaintiff, Mitchell returned to secure the remaining suspects.   According to the plaintiff's testimony, one of the suspects had run away during Mitchell's altercation with the plaintiff.   The record indicates that while

---

Q: Your what?

A: Dig beaters. It's a term that we use, dig beaters. Those are your hands.

[7] With regard to who made the first contact, Mitchell testified as follows:
Q: In other words, the physical confrontation itself is the felony obstruction?

A: It's an event.   He prevented me from searching the person I was arresting causing me to get into a physical confrontation with him.   He pushed his chest up on me. The entire thing – that entire aspect is the felony obstruction.

Q: So does the felony obstruction start before he puts his chest on you?

A: No. Because at that time he was just arguing.

Q: And then he puts his chest on you.   Is that where the felony obstruction begins?

A: That's the prerequisite.

6

Mitchell was with the remaining suspects the plaintiff continued to yell at Mitchell.

After the plaintiff's initial contact with Mitchell, the plaintiff admitted that he pushed Mitchell.[8] The record indicates

---

[8] With regard to plaintiff's push of Mitchell, the plaintiff testified:

Q: He pushed you.  He walked away?

A: We was back and forth.

Q: You exchanged some more words, some other -- what did you say when he walked away?

A: He was saying some other derogatory stuff.  I said, you know, you need to make you some kids so you can tell them what to do.

Q: Okay.  So then he comes back?

A: Once the dude run off, he gets on the radio and say blah, blah, blah.  You know, a whole bunch of cars come.

Q: Wait, wait.  So he comes back?

A: Yes, ma'am.

Q: To you?

A: Yes.

Q: And when he comes back to you --

A: That's when I pushed him.

Q: You pushed him?

A: I pushed him back.

Q: You pushed him first?

A: No. He pushed me first.

Q: He pushed you again the second time?

that after Mitchell pushed the plaintiff, the plaintiff became angry and pushed Mitchell.   Sometime after Mitchell first pushed the plaintiff, the plaintiff's shirt came off.   The plaintiff alleges that Mitchell pulled his shirt off him during a physical struggle that ensued after he pushed Mitchell.   Mitchell alleges that the plaintiff pulled it off himself to display a full body suit of gang tattoos in an attempt to intimidate him.   Regardless of how the shirt came off, the plaintiff admitted after Mitchell first pushed him, he began "tussling" or wrestling with Mitchell.   During this "tussling," Mitchell attempted to bring the plaintiff under control by grabbing hold of the plaintiff.

The plaintiff admitted he challenged Mitchell to a physical confrontation.   It was the plaintiff's testimony that the plaintiff

---

A: And I pushed him back.

Q: Wait.   You pushed him a second time?

A: I pushed him one time.

Q: Wait. He pushed you.   He walked away.   He came back --

A: And I pushed him.

Q: And you pushed him?

A: Yeah. Yes, ma'am.

Q: Okay. And then after you pushed him --

A: He grabbed --

Q: -- he grabbed you by your shirt.

8

somehow got loose from Mitchell's grasp and "put [his] dukes up" referring to his fists and he yelled to Mitchell "like, come on, you want a piece?" In response, Mitchell drew his gun and told the plaintiff to get down on the ground. It is undisputed that the plaintiff refused to obey Mitchell's direction to get down to the ground. The plaintiff testified that he believed that Mitchell's demand was racist and further testified that he refused to comply because he had previously had leg surgery which prevented him from bending down. The plaintiff testified that he continued to yell at Mitchell while Mitchell had his gun in his hand.

The plaintiff admitted that he did not comply with Mitchell's request to get to the ground even after Mitchell drew his gun and that he refused to submit to Mitchell's directions. Mitchell then attempted to bring the plaintiff under control by grabbing him by the belt of plaintiff's pants, while the gun was in his hand. When other police officers responded to Mitchell's request for backup, the other police officers, including Powell who had returned from apprehending the suspect he had caught, saw the plaintiff and Mitchell involved in a physical confrontation. The other officers tackled and took the plaintiff to the ground. The plaintiff admitted that it took physical force to bring him under control even after the other officers brought him to the ground.[9] After

---

[9] The plaintiff testified:
Q: So when you fall to the ground, are you fighting with him then or are you just still?

9

the plaintiff was finally subdued, handcuffs were placed on him and the plaintiff was taken into custody.  The plaintiff was placed in the back of Powell's police vehicle for transport to the DeKalb County Jail.

With regard to the alleged terroristic threat charge, the plaintiff testified as follows:

> A: When they had me handcuffed, when they finally picked
> me up after they tackled me on the ground and put me in
> the car, I said I'm going to have my folks holler at you.
> You going to hear from me, and that's what I said.  Now
> they can take that any way they want to.
> Q: Okay.
> A: But when I said I'm going to have my folks holler at
> you meaning I was going to have, you know, somebody like
> him holler at them.
> Q: Like your lawyer?
> A: Yeah.  I'm going to get somebody on you.  Somebody
> going to look into this matter and you're going to wish
> that you hadn't of done this because this is not cool.
> Q: So did you ever say should I clip this cat?
> A: Should I clip him? Yeah, I probably said that.
> Q: What does that mean?
> A: You know, like clip you on the chin.
> Q: Oh, like a -- like you were going to punch him?
> A: Yeah.
> Q: Okay.

Moreover, the plaintiff testified as follows:

---

> A: Oh no. I was -- you know, I was fired up.  I wasn't
> going to just fall to the ground and be still.
>
> Q: So what did you do?
>
> A: We was tussling until they came and piled on top of me
> and flattened me and then they restrained me.  Because he
> had my face on the ground.  It was summertime.  You know
> what I mean?  Around the hot time.  You know, the
> concrete is hot.

```
Q: Did you threaten any of the officers?
A: What you mean threaten them?
Q: Well, maybe that's not the right term.  Did you tell
any of the officers --
A: I used the terms like I'm going to have my peoples get
you.
Q: You said that?
A: My peoples going to get on you.  But see, they took it
in a form like I was going to have my people.  No, we
going to get you with their pen.[10]
```

According to the affidavit for the issuance of a criminal warrant prepared by Mitchell:

> The defendant made threats to hurt me when he sees me on
> the street.  "I know your name, I am going to hurt you
> when I see you on the street."  Threats were made to harm
> Officer Mitchell.

Thereafter, the plaintiff was charged with two counts: one count of felony obstruction of justice and one count of making terroristic threats.  At the preliminary hearing to determine bond, the plaintiff was given a $40,000 cash-only bond.  Since he was unable to make the bond, he was incarcerated for 186 days while awaiting trial.  On March 8, 2001, the plaintiff's mother filed an excessive use of force complaint with the DeKalb County Police Department's Internal Affairs Unit because Mitchell had drew his gun on the plaintiff during the above incident.  The DeKalb County

---

[10] In his deposition, Powell testified:
Q: Well, let me ask you this specifically.  What were the
terroristic threats that Mr. Alfred made to either you or
to Mr. Mitchell?  That's my question.

A: Wasn't to me.  It was to Officer Mitchell.  We were
walking into the jail.  And I couldn't give you word for
word what was said.  It was something about getting him
or something to the effect.  And that was it.

Police Department conducted an investigation into that complaint.[11]

The plaintiff was released from jail on September 12, 2001, after he had been acquitted of the charge of felony obstruction and the making terroristic threats charge had been dismissed.   On September 9, 2003, the plaintiff filed the instant action.

On September 20, 2005, Powell and Mitchell filed a motion for summary judgment [Doc. No. 37].   In his complaint, the plaintiff did not indicate whether his claims were brought against Mitchell and Powell in their individual and/or official capacities.   At the

_____

[11] While the report produced by the DeKalb County, Georgia Police Department Internal Affairs Unit (herein referred to as the "Internal Affairs police report") concluded that Mitchell's display of a weapon was an exercise of poor judgment, the report concluded that "there is no question in this writers (sic) mind that Officer Mitchell felt that the suspect posed an immediate threat of physical violence to him when he displayed his firearm."

The report continued:  "Additionally, based on the Internal Affairs interview with Christopher Battle, it is very clear that he intentionally attempted to provoke Officer Mitchell with his verbal abuse.   Christopher Battle proudly told us that he 'whipped him psychologically.'"

The report concluded:

This investigation has not uncovered any other evidence that indicates there was any other type of excessive force used during this arrest.   Therefore, with some reservation, the finding of this investigation as related to the use of force is NOT SUSTAINED.

During the course of this investigation it was determined that Officer Mitchell's arrest/incident report was extremely lacking in detail as related to the arrest of Christopher Battle on two felony charges, (see exhibit A.)   This is being referred back to Line Level for review and consideration.

12

deposition of the plaintiff, his counsel stated that he was not bringing any official capacity claims. The court takes plaintiff's counsel's representation during the deposition as a voluntary dismissal of any potential official capacity claims against Mitchell and Powell. Moreover as stated above, the plaintiff conceded that Powell should be dismissed as a defendant.[12] Therefore, the court concludes that the sole remaining defendant is Mitchell in his individual capacity.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her on which he or she bears the ultimate burden of proof. Id. at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the

---

[12] Although the plaintiff never filed a stipulation for dismissal to defense counsel formally dismissing Powell, the court accepts counsel's statement as the functional equivalent of a formal dismissal.

pleadings and by . . . affidavits, or by the 'depositions, answers
to interrogatories, and admissions on file,' designate 'specific
facts showing that there is a genuine issue for trial.'" Id. at
324.   Rule 56(c) mandates the entry of summary judgment against a
party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial. Id. at
322.

### III. Legal Discussion

"Qualified immunity offers complete protection for government
officials sued in their individual capacities if their conduct
'does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.'" Vinyard v.
Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) quoting Harlow v.
Fitzgerald, 457 U.S. 800, 818 (1982).   To receive qualified
immunity, the public official must first prove that he was acting
within the scope of his discretionary authority when the allegedly
wrongful acts occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th
Cir. 2002). Here, it is clear and undisputed that Mitchell was
acting within the course and scope of his discretionary authority
when he arrested and charged the plaintiff.   "Once the defendant
establishes that he was acting within his discretionary authority,
the burden shifts to the plaintiff to show that qualified immunity
is not appropriate." Id.

14

The United States Supreme Court has set forth a two part test for the qualified immunity analysis.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Saucier, 533 U.S. at 201.  However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346 quoting Saucier, 533 U.S. at 201.  Thus, the court must first analyze whether Mitchell's conduct of arresting the plaintiff for the offenses, taken in the light most favorable to the plaintiff, violated the plaintiff's constitutional rights.

### A. False Arrest Claim

In his complaint, the plaintiff alleges: "The arrest was accomplished without a warrant and without probable cause." While a warrantless arrest without probable cause violates the Constitution and provides a basis for a 42 U.S.C. § 1983 claim, the existence of probable cause at the time of arrest constitutes an absolute bar to a 42 U.S.C. § 1983 claim for false arrest. Marx v. Gumbinner, 905 F.2d 1503, 1505-6 (11th Cir. 1990).  An officer has

probable cause standard to arrest a suspect when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction. Lee, 284 F.3d at 1195. Thus to succeed on a false arrest claim under 42 U.S.C. § 1983, the plaintiff bears the burden of demonstrating the absence of probable cause. Rankin, 133 F.3d at 1436.

The issue here, however, is not whether probable cause existed but instead whether there was "arguable probable cause" for the plaintiff's arrest. See Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)(noting that "arguable probable cause" and not the higher standard of actual probable cause governs the qualified immunity inquiry). See also Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)(holding that for an officer to receive qualified immunity protection, he need not have actual probable cause but needs only to have "arguable probable cause"). Because only "arguable probable cause" is needed, the inquiry is not whether probable cause actually existed, but instead whether an officer

reasonably could have believed that probable cause existed, in light of the information the officer possessed. Id. Law enforcement officials who reasonably, but mistakenly, conclude that probable cause is present are entitled to immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991).

Whether a particular set of facts gives rise to actual probable cause or "arguable probable cause" for an arrest depends on the elements of the crime. Crosby v. Monroe County, 394 F.3d 1328,1332 (11th Cir. 2004). Therefore in order to determine whether either actual probable cause or "arguable probable cause" existed to arrest the plaintiff, the court must first examine the crimes of felony obstruction and making terroristic threats under the applicable Georgia statutes.

### 1. Felony Obstruction

O.C.G.A. § 16-10-24, titled "Obstructing or hindering law enforcement officers," states:

> (b) Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer, prison guard, correctional officer, probation supervisor, parole supervisor, or conservation ranger in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

O.C.G.A. § 16-10-24(b) requires proof that the accused offered or did violence to the person of an officer. See Duke v. State, 205 Ga. App. 689, 690 (1992). Courts have found that verbal threats of

17

force or violence can obstruct an officer and authorize a felony conviction under O.C.G.A § 16-10-24(b). <u>Jackson v. State</u>, 213 Ga. App. 520, 521 (1994). Viewing the facts in the light most favorable to the plaintiff in the current case, the court concludes the plaintiff is unable to establish that his arrest for obstructing or hindering a law enforcement officer was unreasonable or in violation of his Fourth Amendment rights, given the fact that both actual and "arguable probable cause" existed to arrest the plaintiff.[13]

In his deposition, the plaintiff testified that the suspects that Mitchell was questioning were probably smoking marijuana and drinking beer. The plaintiff testified that he approached Mitchell and the female suspect either during or shortly after Mitchell's frisk of the female suspect to warn her to get an attorney and to alert her to the fact that Mitchell was touching her in an inappropriate manner. The plaintiff admitted that he made various derogatory statements to Mitchell. Furthermore, the plaintiff admitted that his actions distracted Mitchell so much that Mitchell dropped what he was doing with the suspects in order to confront the plaintiff. The plaintiff also testified that Mitchell told the

---

[13] In attempt to defeat Mitchell's motion for summary judgment, the plaintiff submitted the affidavits of several "witnesses" to the events that gave rise to this suit. This court gave these affidavits little weight. On many points, these affidavits directly contradicted the plaintiff's sworn testimony in his deposition.

plaintiff to leave the scene or "go home." The plaintiff admits that he refused to leave the scene after repeatedly being told to do so by Mitchell. Additionally, the plaintiff admitted that he refused to lie on the ground when Mitchell ordered him to do so.

With regard to the component of the criminal offense which requires an individual to offer or do violence to the police officer, the plaintiff testified and admitted that he physically pushed Mitchell. Moreover, the plaintiff admitted that he "tussled with" Mitchell and that he resisted going to the ground even after Mitchell grabbed him. In fact, the plaintiff testified that he challenged Mitchell to a physical confrontation. He testified that he "put [his] dukes up," referring to his fists, and yelled to Mitchell "you want a piece of me?" Finally, the plaintiff continued to wrestle with Mitchell both prior to and after the arrival of the other police officers to the scene, and he admitted that it took several police officers to force him to submit to police authority.

The court concludes that the plaintiff's actions admitted to in his deposition would lead a reasonable police officer to suspect that his physical safety was threatened. The court concludes that this particular plaintiff by his own admission and as indicated by his actions and words wanted to fight Mitchell. Moreover, the plaintiff's own testimony indicates that he was obstructing the officer's efforts to conduct a criminal investigation of the scene

by attempting to fight, by distracting, by pushing, and by verbally abusing and yelling at Mitchell.  Given these facts, Mitchell had both actual and "arguable probable cause" to arrest the plaintiff and charge him with felony obstruction under O.C.G.A. § 16-10-24(b).

## 2. Making Terroristic Threats

Next, the court must examine O.C.G.A. § 16-11-37, titled "Terroristic threats and acts; penalties":

> (a) A person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence, to release any hazardous substance, as such term is defined in Code Section 12-8-92, or to burn or damage property with the purpose of terrorizing another or of causing the evacuation of a building, place of assembly, or facility of public transportation or otherwise causing serious public inconvenience or in reckless disregard of the risk of causing such terror or inconvenience.  No person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated.

In the plaintiff's response to Mitchell's motion for summary judgment, he argues that the statements contained within the Internal Affairs report and the affidavit in support of warrant should be excluded because such statements were hearsay statements which do not fall within any of the recognized hearsay exceptions. Additionally, the plaintiff argues that the statements contained in the Internal Affairs police report and affidavit were fabricated by Mitchell to create the basis for the terroristic charge.  Even if this court were to exclude the specific statements contained in the affidavit for issuance of criminal warrant, i.e., that the

plaintiff knew Mitchell's name and was going to hurt him when he saw Mitchell on the street, the court would still conclude that both actual and "arguable probable cause" existed to arrest the plaintiff for making terroristic threats based solely on the plaintiff's own testimony regarding what he said to the officers during and after his arrest.

With regard to the terroristic threat charge, the plaintiff testified as follows:

> A: When they had me handcuffed, when they finally picked me up after they tackled me on the ground and put me in the car, I said I'm going to have my folks holler at you. You going to hear from me, and that's what I said.  Now they can take that any way they want to.
> Q: Okay.
> A: But when I said I'm going to have my folks holler at you meaning I was going to have, you know, somebody like him holler at them.
> Q: Like your lawyer?
> A: Yeah.  I'm going to get somebody on you.  Somebody going to look into this matter and you're going to wish that you hadn't of done this because this is not cool.
> Q: So did you ever say should I clip this cat?
> A: Should I clip him? Yeah, I probably said that.
> Q: What does that mean?
> A: You know, like clip you on the chin.
> Q: Oh, like a -- like you were going to punch him?
> A: Yeah.
> Q: Okay.

Moreover, the plaintiff testified as follows:

> Q: Did you threaten any of the officers?
> A: What you mean threaten them?
> Q: Well, maybe that's not the right term.  Did you tell any of the officers --
> A: I used the terms like I'm going to have my peoples get you.
> Q: You said that?
> A: My peoples going to get on you.  But see, they took it

21

in a form like I was going to have my people.  No, we
going to get you with their pen.

According to the Eleventh Circuit in <u>Kingsland v. City of
Miami</u>, 382 F.3d 1220, 1232-1233 (11th Cir. 2004), the plaintiff must
demonstrate that no reasonable officer could have found probable
cause under the totality of the circumstances.  Mitchell argues
that the plaintiff's comments take on a different meaning if the
court considers that the plaintiff is a former gang member from Los
Angeles, California, and if the court considers the plaintiff's
previous violent behavior.  The court agrees and concludes that it
is appropriate for the court to examine the totality of the
circumstances of the plaintiff's arrest when determining whether
probable cause existed for the arrest.

Even if this court were to exclude the statements contained
both within the Internal Affairs police report and affidavit used
to issue the warrant, the court finds that the plaintiff's own
testimony regarding what he said to Mitchell provided Mitchell with
both the  actual probable cause needed to arrest the plaintiff for
making terroristic threats and the "arguable probable cause" to
provide Mitchell with the qualified immunity protection for making
such an arrest.  Specifically, the plaintiff admitted that he said
he was "going to have his people get" Mitchell and that he was
going or wanted to "clip" Mitchell.  Given the totality of the
circumstances surrounding the plaintiff's arrest and his prior

22

actions, a reasonable officer, even if Mitchell was mistaken as to the plaintiff's intentions, could have interpreted such comments as threats of violence.   Therefore, the above comments provided Mitchell with both actual and "arguable probable cause" to arrest the plaintiff for making terroristic threats under O.C.G.A. § 16-11-37(a).

In his response in opposition to Mitchell's motion for summary judgment, the plaintiff argues that the statements contained in the Internal Affairs police report and in the affidavit issued to issue the warrant were fabricated and therefore a jury question exists as to whether sufficient probable cause existed for arresting the plaintiff for making terroristic threats.   This court disagrees. This case is distinguishable from Kingsland, which was relied upon by the plaintiff.   The Eleventh Circuit in  Kingsland found that there was insufficient evidence independent of the allegedly fabricated evidence in the record in that case to determine whether probable cause existed to charge the plaintiff.   In this case, even if this court were to exclude the statements contained in both the Internal Affairs police report and within the affidavit used to issue the warrant which were allegedly fabricated by Mitchell, the plaintiff's own testimony at his deposition regarding what he said after his arrest provides this court with sufficient evidence of both probable cause and "arguable probable cause."   In fact, the plaintiff's own testimony collaborates that the plaintiff made

comments that could have been interpreted as threats of violence directed towards Mitchell given the totality of the circumstances of his arrest and his prior actions at the scene.

Also in the plaintiff's response to the defendant's motion for summary judgment, the plaintiff states that there is no corroboration for any of the plaintiff's alleged threats to Mitchell.   However, the plaintiff's argument misses the mark, collaboration is necessary for an individual to be convicted under the statue in question.   To determine whether Mitchell is entitled to qualified immunity, the court is concerned only with whether Mitchell had either actual or "arguable probable cause" to arrest the plaintiff for the offense, not with whether there was sufficient evidence to convict.   As stated above, the court finds that the plaintiff's own testimony in his deposition regarding what he said to Officer Mitchell was sufficient in itself to find that Mitchell had sufficient probable cause to arrest the plaintiff; whether such evidence was sufficient to convict on such an offense is a different matter.

In sum, the court finds that the evidence in the record is sufficient to find that both actual and "arguable probable cause" existed to arrest the plaintiff for both offenses.   Because the plaintiff has not established a Fourth Amendment violation of his rights with regard to his arrest for either criminal offense, Mitchell is entitled to qualified immunity on the plaintiff's false

arrest claim under 42 U.S.C. § 1983.

## B. False Imprisonment and
## Malicious Prosecution Claims under 42 U.S.C. § 1983

Section 1983 claims for false imprisonment and malicious prosecution are recognized as federal law claims under the Fourth Amendment. In his response in opposition to Mitchell's motion for summary judgment, the plaintiff correctly notes that there is a 42 U.S.C. § 1983 claim for false imprisonment under the Fourteenth Amendment as well as the Fourth Amendment. Ortega v. Christian, 85 F.3d 1521, 1525-6 (11th Cir. 1996). In Wood v. Kesler, 323 F.3d 872, 881 (11th Cir.2003), the Eleventh Circuit identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under 42 U.S.C. § 1983. A prerequisite of both false imprisonment and malicious prosecution claims is the absence of probable cause. Ortega, 85 F.3d at 1526 (noting that where a police officer lacks probable cause to make an arrest, the arrestee has a claim under 42 U.S.C. § 1983 for false imprisonment based on a detention pursuant to that arrest.) Similarly, in Wood, 323 F.3d at 882, the court stated that the absence of probable cause is a required element of a 42 U.S.C. § 1983 malicious prosecution claim.

The court's finding of the existence of probable cause for the plaintiff's arrest on the two offenses necessarily bars the plaintiff's claims for false imprisonment and malicious prosecution under federal law as well. In this case, the plaintiff has failed

to show that his arrest for the two offenses in question lacked "arguable probable cause."  As this court discussed above, the court found that the plaintiff's own version of the events as described in his deposition provided Mitchell with the necessary probable cause needed to arrest him for the offenses in question. Therefore, Mitchell is entitled to summary judgment on the plaintiff's claims for false imprisonment and malicious prosecution brought pursuant to 42 U.S.C. § 1983.

### C. State Law Claims

The plaintiff's only remaining claims against Mitchell are state law claims.  In the plaintiff's complaint, the plaintiff alleges that the "Defendants falsely imprisoned and maliciously prosecuted Plaintiff under state law and deprived him of his physical liberty."  In his motion for summary judgment and reply brief, Mitchell argues that he is entitled to official immunity under Georgia law from the plaintiff's state law claims.

The court declines to exercise its supplemental jurisdiction to evaluate the merits of the plaintiff's state law claims.  With the court's dismissal of the plaintiff's federal claims, there remains no federal claims upon which this court has original jurisdiction.  Pursuant to 28 U.S.C. § 1367(c)(3), the court has discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the court has dismissed all claims over which it had original jurisdiction. Palmer v. Hospital

Authority of Randolph County, 22 F.3d 1559, 1567-68 (11th Cir. 1994).   In exercising its discretion provided by 28 U.S.C. § 1367(c)(3), the court concludes that the plaintiff's remaining state law claims in this action are best resolved by a Georgia state court.

### IV. Conclusion

For the reasons stated above, Mitchell's motion for summary judgment [Doc. No. 37] is GRANTED with respect to the plaintiff's federal claims.   The court declines to exercise supplemental jurisdiction over the plaintiff's state law claims and those claims are DISMISSED without prejudice.

SO ORDERED, this _12th_ day of December, 2005.

_Robert L. Vining, Jr._
ROBERT L. VINING, JR.
Senior United States District Judge